OPINION.
The defendant-appellant, Henry O'Hara, appeals from his conviction for kidnapping and rape. In the assignments of error set forth by his appellate counsel, he contends that the trial court erred by (1) allowing impeachment based on his prior convictions; (2) failing to declare a mistrial due to the state's failure to disclose exculpatory evidence; (3) failing to properly handle questions posed by the jury during deliberations; (4) entering a judgment of conviction contrary to the weight of the evidence; and (5) sentencing him on allied offenses of similar import. O'Hara contends additionally that his trial attorney rendered ineffective assistance.
We do not find merit in any of these assignments of error. Nor do we find merit in the assignments of error set forth by O'Hara in his pro se
brief, in which he challenges the imposition of the maximum sentence on each charge and his adjudication as a sexual predator. Accordingly, we affirm the judgment of the trial court.
 FACTS
On December 27, 1999, at approximately 12:45 p.m., Maureen Hicks, while on a lunch break from work, entered a La-Z-Boy Furniture store to drop off some paperwork and a check as part of her job duties. After leaving the store, she walked over to her vehicle, a Chevrolet Venture minivan, and noticed O'Hara in the front passenger seat of the vehicle parked next to it.
After Hicks seated herself in her van, she waited, expecting O'Hara to leave his vehicle. O'Hara got out of his car but, instead of moving on, opened the unlocked door of Hicks's van and told her to scoot over. Hicks testified that O'Hara tried to calm her by telling her that he was not going to hurt her, and that he only needed a ride. Hicks further testified that she then told O'Hara, if that was the case, to take the van, not her. Although Hicks sought to alert others by honking her horn, no one responded. O'Hara became angry, grabbed her hair, and shoved his way into the van. According to Hicks, O'Hara was now cursing loudly and reaching into his coat pocket, as if he had a gun, while threatening to "blow her brains out." O'Hara told Hicks several times not to look at him because he did not want her to see what he looked like.
O'Hara ordered Hicks down on the floor of the van and then drove onto the Cross-County Highway. Hicks testified that along the way O'Hara told her that he was sorry "that he had to do this," that he was a churchgoing man, and that he was going to let her go. He denied any intent to rape her. O'Hara eventually stopped the vehicle alongside the highway. Hicks testified that O'Hara then asked her if she had ever fantasized about having sex with a black man, and more specifically (and more graphically) if she had ever had a black man perform cunnilingus upon her. In what ensued, O'Hara removed Hicks's underclothes and forcibly performed the act upon her. According to Hicks, O'Hara then remarked upon the size of his penis and asked her if she wanted to have sexual intercourse. Hicks testified that she replied that she just wanted to be let go. O'Hara then drove Hicks back to the La-Z-Boy parking lot.
Hicks noticed and remembered the license plate of the car that O'Hara had earlier been sitting in. She stated that O'Hara told her that he was sorry for what he had done but that "black men aren't like white men," and that once he saw her he had to have her. According to Hicks, O'Hara also expressed his desire that she not go to the police, and told her that he was going to go home and engage in sexual self-gratification with his unusually large penis while thinking about her.
Hicks testified that, before getting out of the van, O'Hara asked her for twenty dollars because his car needed gas. She handed him two twenty-dollar bills. She testified that, to her disbelief, O'Hara then began crying and proclaiming that he was a churchgoing person with a wife and two children, and that he had never done anything similar before. According to Hicks, O'Hara asked for a kiss, which she refused, and he then got out of the van and allowed her to drive off.
Hicks subsequently drove to a fire station on Springdale Road and requested the receptionist to contact the police. When the police arrived, she gave a statement, including the license-plate number of the vehicle O'Hara had been using, and was driven to the Hamilton County Sheriff's station on Hamilton Avenue. Later she was taken to University Hospital for examination.
Police traced the license-plate number Hicks had given them to O'Hara's brother, "T.J." O'Hara was then arrested on January 10, 1999, positively identified by Hicks, and charged with kidnapping and rape.
O'Hara testified that on December 27, 1999, he and Hicks were far from strangers. He testified that he had first met Hicks in a Wal-Mart store in either mid-October or early November of that year. According to O'Hara, although shopping with his then wife, he had struck up a conversation with Hicks and given her his telephone number. He stated that he received a telephone call from Hicks about a week later, after he had forgotten about her, in which she suggested that they meet again at the Wal-Mart. According to Hicks, their subsequent meeting began an adulterous relationship that involved Hicks coming over to his house for sexual trysts. He stated that Hicks was known by his brothers and by a nephew, Charlie.
O'Hara testified that on the day of the alleged offense he received a telephone call from Hicks asking him to meet her at a K-Mart on Colerain Avenue. He testified that when they met, he got into Hicks's van, as he had done on many prior occasions, and that she then drove them to a bank, where he waited in the van while she went inside. He stated that afterward they drove together to the La-Z-Boy store, where Hicks paid a bill, and that they next drove to his home. He stated that they "began to get intimate," but that he did not perform oral sex upon her. He testified that his brother, "T.J.," who was staying at his house, then interrupted them. According to O'Hara, T.J. was wearing boxer shorts and was exposing himself in an obvious sexually aroused state. He testified that his brother's behavior frightened Hicks, that she wanted to leave, and that she then drove them back to the parking lot at K-mart. He stated that he felt that Hicks was blaming him for bringing her back to his home for a ménage a trois with his brother, which had not been the case. He described Hicks as being angry with him, but not too angry to give him a goodbye kiss when he asked for one.
O'Hara stated that he saw Hicks in public after that, and that she refused to talk to him. He stated that he assumed that Hicks's indifference was because of his brother's sexually threatening behavior and her belief that he had somehow attempted to engage her in a ménage a trois.
O'Hara's brother T.J. was not called as a defense witness. His nephew, Charles, testified that on one occasion he had seen his uncle with a white woman whom he now recognized as Hicks. Both O'Hara and Charles had records of numerous, significant criminal convictions. The detective who had arrested O'Hara stated that O'Hara did not know Hicks's last name at the time he was taken into custody, despite his professed intimate relationship with her. (Nor was O'Hara aware of a rose tattoo that Hicks had on her ankle and displayed to the jury in rebuttal.) Contrary to his testimony at trial, O'Hara told the detective that he had had oral sex with Hicks that afternoon, and that T.J. was not at his house when that had occurred. O'Hara also told the detective that he did not know why Hicks would have made up the charges against him. Asked to explain the discrepancies between his statement to the detective and his trial testimony, O'Hara stated that he had only admitted to having oral sex with Hicks because the detective had promised to drop the kidnapping charge if he did so, and that he had lied about T.J. not being at his house because he did not know what T.J. had told the detective in a separate interview.
The jury, choosing not to believe O'Hara's testimony, found him guilty of both kidnapping and rape.
PRIOR CONVICTIONS
In his first assignment of error, O'Hara argues that the trial court erred by overruling his motion in limine, pursuant to Evid.R. 609, to prevent the prosecution from introducing evidence of his convictions more than ten years in the past.
As this court has noted,
 A ruling on a motion in limine reflects the court's anticipated treatment of an evidentiary issue at trial, and as such it is a tentative, interlocutory, and precautionary ruling. In deciding such motions, the trial court is at liberty to change its ruling on the disputed evidence in the actual context of the trial. Finality does not attach when the motion is granted. Defiance v. Kretz (1991), 60 Ohio St.3d 1, 4, 573 N.E.2d 32, 35, citing State v. Grubb (1986), 28 Ohio St.3d 199, 201-202, 503 N.E.2d 142, 145.
State v. Clowers (1999), 134 Ohio App.3d 450, 454,731 N.E.2d 270, 273. It is incumbent, therefore, upon the party aggrieved by a ruling on a motion in limine to raise the issue at trial, at which point finality attaches to the trial court's decision and the issue is preserved for appeal. Grubb, supra, paragraph two of the syllabus.
Here, counsel for O'Hara did not raise the issue at trial after receiving an adverse ruling on the motion in limine. To the contrary, counsel chose the opposite tack, which was to preemptively disclose O'Hara's lengthy criminal record to the jury at the beginning of his testimony. Before doing so, counsel asked O'Hara if it was not true that he wanted the jury to know about his criminal record. O'Hara responded, "Yes. Yes I do. As a matter of fact, I asked — I asked you as my attorney, to get my criminal record blown up [so that it could be shown to the jury]." Counsel then began inquiring about O'Hara's criminal past, beginning with a conviction in 1973 for larceny by trick.
By adopting this strategy of candor, rather than objecting to the prosecution's use of the past convictions to impeach him on cross-examination, O'Hara clearly waived any right to object to their admission under Evid.R. 609. His first assignment of error is, therefore, not well taken.
DISCLOSURE OF EXCULPATORY EVIDENCE
In his second assignment of error, O'Hara argues that he should have been granted a mistrial because the prosecutor did not disclose upon pretrial discovery Hicks's written statement to the Colerain Township police officers who had initially investigated the case. According to O'Hara, the statement was favorable to the defense because in it Hicks had placed the time of the offenses at 1:45 p.m. and had never claimed that O'Hara actually had a gun.
The existence of the written statement was revealed during Hicks's testimony. Defense counsel, after Hicks had completed her testimony, moved to have the statement examined under Crim.R. 16(B)(g). That section provides, upon request of the defendant, for an in camera inspection of a witness's statement by the court, with the attorneys participating, to determine the existence of any inconsistencies between the statement and the trial testimony. The trial court here conducted such an inquiry. Although the court did not find any inconsistencies, defense counsel felt that the 1:45 p.m. time given to the Colerain police was sufficiently inconsistent with Hicks's earlier testimony to warrant recalling Hicks for further cross-examination. The court stated that it would allow the defense to recall Hicks for the purpose of questioning her about any perceived discrepancy. But when Hicks was later recalled by the state as a rebuttal witness on an unrelated matter, defense counsel chose not to question her about the time of the offenses. And at no time did counsel suggest that there was any inconsistency between Hicks's testimony and her prior statement in which she had never claimed that O'Hara actually possessed a weapon.
Despite the trial court's scrupulous adherence to the procedure set forth in Crim.R. 16(B)(G), O'Hara now argues that Hicks's statement was exculpatory information that the prosecution "suppressed" in violation ofBrady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194. In Brady, the United States Supreme Court held that the prosecution violates the defendant's right to due process when it fails to exchange evidence that is both favorable to the defendant and material to guilt or punishment.Id. at 87, 83 S.Ct. at 1196-1197. In order for evidence to be deemed material, there must a reasonable probability that, had the state disclosed the evidence, the result of the trial would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. United States v. Bagley (1985),473 U.S. 667, 682, 105 S.Ct. 3375, 3393.
The state argues that there were no discrepancies in Hicks's statements, let alone material ones. The state points out, in this regard, that Hicks merely testified that she had gone to the La-Z-Boy store at 12:30 p.m., and that, taking into account all that had transpired later, she was probably raped at very close to 1:45 p.m. The state also argues that there was no discrepancy between her testimony that O'Hara had acted as if he had a gun by sticking his hand into his coat pocket, and her earlier statement in which she had made no claim that he actually had a gun.
We agree with the state that whatever slight difference there was between Hicks's testimony and her earlier statement was not material, and certainly was not sufficient to undermine confidence in the verdict reached by the jury. Moreover, we disagree with O'Hara that the prosecution "suppressed" the statement. The statement was appropriately produced pursuant to the procedure set forth in Crim.R. 16(B)(g). Although O'Hara argues that, because the statement was not disclosed prior to trial, he was deprived of the opportunity to effectively cross-examine Hicks, this argument ignores the fact that the trial court expressly granted defense counsel leave to recall Hicks and to inquire about the alleged time discrepancy. Counsel did not take advantage of this opportunity.
Further, although O'Hara cites this court's decision in State v.Henderson (June 9, 2000), Hamilton App. No. C-990657, unreported, as support for his position, he overlooks a very important difference between that case and this. In Henderson, the trial had concluded and the defendant had been found guilty before defense counsel discovered exculpatory evidence in police files. Here, the trial was still in progress. Had defense counsel felt prejudiced by the lack of earlier disclosure, she had the option of requesting a continuance. The fact that she did not defeats a claim of prejudice. As the Ohio Supreme Court held in State v. Edwards (1976), 49 Ohio St.2d 31, 42-43, 358 N.E.2d 1051,1059-1060, a defendant cannot claim prejudice on the basis of surprise by the revelation, during trial, of nondisclosed evidence, when the defendant fails to move for a continuance at the time of the objection.
O'Hara's second assignment is overruled.
 READBACK
In his third assignment of error, O'Hara argues that the trial court committed plain error when it failed to follow up on a series of questions posed by the jury during deliberations. Among other things, the jury asked whether it could "get" the testimony of one witness and "[w]hat was" the testimony of another. The jury's questions also included requests to examine certain exhibits not in evidence. The trial court advised the jury that it was limited to only the exhibits admitted into evidence. With respect to the requested testimony, the court stated that the testimony was available upon request, but that it would "take some time, obviously." The court then advised,
 So what I would request of you at this point, is this. You've heard my responses to all the questions. I would ask you to go back and continue your deliberations if you can, at this point. Write out — as soon as you go back though — if you feel it's appropriate, have the foreperson write out regards to the testimony, what testimony that you want, and at that point I will consider that.
 If I feel that's appropriate, I will then ask the court reporter to go retrieve that. Once she has that altogether, we will bring you back into court at that point. Interrupt your deliberations, bring you in, give you that material that you've requested, and then proceed from there. Okay.
 Significantly, after making this response to the jury's requests, the trial court asked both the prosecutor and defense counsel if they had any comment upon the record. Defense counsel replied, "No, your Honor. I've discussed the questions and answers with Mr. O'Hara, and we have no objection to anything that you've said."
On appeal, O'Hara now argues that the trial court, in fact, denied the jury's request to read back certain testimony. O'Hara further argues, in the face of counsel's failure to object, that the trial court's improper "denial of information" constituted plain error. We disagree.
The trial court manifestly did not deny the jury's request for testimony, but only cautioned that such a request would take some time and that the jury should fully consider the request and submit it in writing. The court told the jury that it should do this as soon as deliberations resumed, which means that the jury was not told that it had to proceed without reviewing the testimony if it felt that such a review was necessary to going forward. More importantly, defense counsel stated on the record that, after discussion with O'Hara, there was no objection to such a procedure.
In order to find plain error under Crim.R. 52(B), we must determine (1) whether there was error, (2) whether it was plain error, and (3) whether the defendant was prejudiced. United States v. Olano (1992), 507 U.S. 725,519-521, 113 S.Ct. 1770, 1777-1778. Here, we do not find any error, let alone plain error, nor can we find any basis to conclude that O'Hara was prejudiced in the absence of any further evidence that the jury continued to have an interest in reviewing the testimony.
O'Hara's third assignment of error is, therefore, overruled.
(IN)CREDIBILITY
In his fourth assignment of error, O'Hara argues that his conviction was contrary to the weight of the evidence. He argues that Hicks's version of events was simply incredible. For example, he contends that it is absurd to believe that the abduction occurred in broad daylight with no one noticing, despite Hicks honking her horn, and that he would stop the van on a highway to perform cunnilingus. He further derides Hicks's testimony that he drove her back to the same parking lot from which he had abducted her, asked her for money, and requested a goodbye kiss. He also decries the complete lack of corroborating physical evidence.
In State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541,546-547, the Ohio Supreme Court stated,
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs v. [Florida (1982), 457 U.S. 31] at 402, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 Ohio B. Rep. 215, 219, 485 N.E.2d 717, 720-721
("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weights heavily against the conviction.")
 Obviously the jury in this case was presented with two vastly different versions of the truth. While O'Hara disparages Hicks's testimony as incredible, it is his version of events that requires the willing suspension of disbelief. To accept O'Hara's version, the jury would have had to accept that Hicks had engaged in an adulterous relationship with a stranger who had approached her out of the blue in a Wal-Mart store; that O'Hara had never learned her last name in the course of their entire intimate relationship, or become aware of a distinctive tattoo on her ankle; and that Hicks, outraged at the sexually perverse behavior of O'Hara's brother (who did not testify), had concocted on the drive home from his apartment an elaborate scheme to falsely charge him with rape that would involve the police and eventually expose their illicit relationship to her husband in a court of law. The jury here would have also had to overlook the fact that O'Hara had initially given a different story to the police when he was arrested, claiming that he had had oral sex with Hicks, and that he had not known why she would falsely charge him with rape and kidnapping. In sum, even sitting as a thirteenth juror, we find no basis to disagree with the twelve in this case that the person engaging in an extraordinarily malicious fiction was O'Hara, not Hicks.
O'Hara's fourth assignment of error is overruled.
INEFFECTIVE ASSISTANCE OF COUNSEL
In his fifth assignment of error, O'Hara argues that he was denied effective assistance of trial counsel. Specifically, he argues that his trial attorney's performance fell below the level of constitutionally required competence, when she (1) withdrew a previously filed motion to suppress, and (2) failed to object to the trial court's responses to the questions posed by the jury during its deliberations.
In support of the first of these alleged deficiencies, O'Hara merely states that his inculpatory statements to the police were produced by coercion. He does not elaborate further by identifying in what manner the statements were coerced. Presumably this argument is in reference to his claim that the detective who took his statements had promised to drop the kidnapping charge in exchange for his false admission to having engaged in oral sex with Hicks. A tape of the interview, however, does not reveal such a promise. The detective testified that he had not initially charged O'Hara with anything other than rape, because he wanted the grand jury to determine any additional charges.
We cannot say that defense counsel's failure to pursue a motion to suppress, based upon the bare allegation that O'Hara's will was overborne by an unsubstantiated promise of leniency, fell below an objective standard of representation. Strickland v. Washington (1984), 466 U.S. 668,686, 104 S.Ct. 2052, 2064; State v. Bradley (1989), 42 Ohio St.3d 136,538 N.E.2d 373, paragraphs two and three of the syllabus. In order to conclude that the failure to pursue such a motion was prejudicial, we would have to assume that there was a probability of success in suppressing the statements. We find no basis to make such an assumption, given O'Hara's obvious lack of credibility.
With regard to the second alleged deficiency, our discussion under the third assignment of error suffices to establish that defense counsel did not violate an essential duty owed to her client.
ALLIED OFFENSES OF SIMILAR IMPORT
In his sixth assignment of error, O'Hara argues that the trial court erred by sentencing him for both rape and kidnapping, since they are allied offenses of similar import. This assignment of error is overruled on the authority of State v. Rance (1999), 85 Ohio St.3d 632,710 N.E.2d 699, since each offense contains at least one element not contained in the other.
ATTACHED PRO SE BRIEF
In addition to raising the six assignments that we have just discussed, O'Hara's appellate counsel has appended as "Exhibit A" a prose brief by O'Hara. Many of the assignments in the pro se brief overlap those raised by counsel. We do note, however, that O'Hara additionally challenges the maximum consecutive sentences meted out to him by the trial court. In challenging these sentences, O'Hara concedes that the trial court made all the findings required by statute — that he had committed the worst form of each offense, that he posed the greatest likelihood of recidivism, and (for the purpose of imposing consecutive sentences) that he was under community control when the offenses were committed, that his criminal history warranted consecutive sentences, and that consecutive sentences were necessary to fulfill the purposes of sentencing under R.C. 2929.11.
O'Hara argues, however, that the kidnapping should not have been considered the worst form of the offense since, even under Hicks's version of events, he drove her back to the same parking lot from which he had abducted her. This argument ignores the fact that along the way he raped her. Not every kidnapping involves a random abduction, threats of murder, and a particularly salacious rape; when it does, it surely qualifies as the worst form of kidnapping. Further, O'Hara argues that because his lengthy criminal history did not involve any prior sexual offenses, he could not be deemed to pose the greatest risk of recidivism. There is no requirement, however, that recidivism be demonstrated by prior sexual offenses. Noting that O'Hara was on parole at the time, the trial court expressed the view that O'Hara's criminal record (which consisted of twenty-two felony convictions) was among the worst that he had ever seen. The court also placed particular emphasis upon the fact that O'Hara had shown absolutely no remorse and had subjected Hicks to a "manufactured hell" and "dragged her through the mud" by trying to depict her during the trial as a liar and an adulterer.
In a related assignment of error, O'Hara argues that the trial court improperly classified him as a sexual predator. In order for an offender to be designated a sexual predator, the burden is on the state to show by clear and convincing evidence that (1) the offender has been convicted of a sexually-oriented offense, and (2) that the offender is likely to engage in the future in one or more sexually-oriented offenses. R.C.2950.01(E) and 2950.09(B)(3).
After the sentencing in this case, the Ohio Supreme Court issued its decision in State v. Eppinger (2001), 91 Ohio St.3d 158, 743 N.E.2d 881. The court in Eppinger recognized that "[o]ne sexually oriented offense is not a clear predictor of whether that person is likely to engage in the future in of or more sexually oriented offenses, particularly if the offender is not a pedophile." Id. at 162, 743 N.E.2d at 886. The court stressed the need for a sexual-predator hearing to remain focused on the likelihood of the offender committing another sexual offense, not on punishing him further for the one he has already committed. Accordingly, the court set forth a model procedure in which the prosecution is required to identify specifically the factors contained in R.C.2950.09(B)(2) upon which it relies, and the trial court is then obligated to discuss on the record "the particular evidence and factors [upon which] it relies in making its determination regarding the likelihood of recidivism." Id. at 166, 743 N.E.2d at 889.
In adjudicating O'Hara a sexual predator in this case, the trial court listened to brief arguments. The prosecution conceded that O'Hara had committed no prior sexually-oriented offenses, but nonetheless stressed the length of his criminal record and argued that he fit the definition of a sexual predator because his offense was rape, "as opposed to a nonviolent sexual offense." The trial court, after listening to an equally brief reply by defense counsel, stated,
 The fact that [O'Hara] now stands convicted of rape, rape that involved the kidnapping, in light of his record, which includes aggravated assault, which is a serious violent offense, in light of the circumstances surrounding this particular incident, I think the Court would be remiss if I would do anything but find him to be a sexual predator.
 Although they were not a pristine form of the discussion contemplated by Eppinger, we hold that the court's remarks were sufficient to provide for effective appellate review. By referring to O'Hara's criminal record, the trial court clearly was identifying as relevant the factor set forth in R.C. 2950.09(B)(2)(b), which allows the court to consider the offender's criminal record "including, but not limited to, all sexual offenses." As we have already noted, O'Hara had twenty-two prior felony convictions, and he was on community control when he committed the instant offenses. O'Hara had spent much of his adult life institutionalized. Although none of the twenty-two prior convictions were sexual in nature, they certainly provided evidence that O'Hara was, and is, a recidivist. Further, by remarking upon the circumstances of the case, the trial court was presumably referring to R.C. 2959.09(B)(2)(h), which allows the court to consider the nature of the offender's sexual contact. It is noteworthy that O'Hara did not simply seize upon an opportunity that presented itself within a familiar social or domestic context; rather, he abducted his victim at random from a public parking lot, in broad daylight. His threat to kill her, combined with the pretense of having a gun, was certainly a display of cruelty, or, at the very least, a threat of cruelty under R.C. 2959.09(B)(2)(i). His statement during the abduction that he had to "have" Hicks once he saw her, and that black men were prone to such fixations, as well as his statement that he planned to go home afterward and engage in a masturbatory fantasy involving a women whom he had just orally raped, indicated an aberrant sexual personality, predatory in nature. Finally the elaborate fiction spun by O'Hara in which he and Hicks had engaged in some sort of intimate relationship, unless a deliberate lie for the purposes of trial, showed a disturbing disconnection with reality and a complete denial of his own deviant behavior.
We hold, therefore, that the trial court sufficiently complied with the model procedure set forth in Eppinger, and that the factors identified by the court were sufficiently compelling to demonstrate clear and convincingly the likelihood of recidivism. We find no error, therefore, in the trial court's classification of O'Hara as a sexual predator.
Accordingly, the judgment of the trial court is affirmed.
 ____________________________ Gorman, Presiding Judge
 WINKLER and SHANNON, JJ., concur.
Raymond E. Shannon, retired, of the First Appellate District, sitting by assignment.
Please Note:
The court has placed of record its own entry in this case on the date of the release of this Opinion.